All right, Mr. Crouch, you can come on to the podium. Mr. Brainy is packing up. All right, you're on. Good morning. Well, we appreciate you agreeing to give us oral argument in this case. This case involves a situation where we have a human resource manager out there. Keep your voice up nice and strong. I'm having a situation where we have a human resources manager out there trying to do the right thing. And the question becomes, what protections is he entitled to? Mr. Miller was the director of human resources. As such, he was the senior HR person for Metrocare Services. Metrocare essentially oversaw the provision of what was observed happening was that, on the one hand, the Department of Labor was looking at case managers and a number of other employees and saying, look, based on these job duties, these people are non-exempt. If they work over time, they're supposed to be paid over time. On the other hand, his, the director of the facility, both the original director and then an acting director of the facility was saying, look, we can't pay for it. We're a public institution and we have limited funds and we can't afford to pay them over time. And so what was happening is these employees were essentially told, don't work overtime. If you have to work overtime, then you have to get the CEO's permission before you get the overtime. If you don't get advance permission, then then you'll be subject to discipline, all at a time when they know that the job, in terms of getting everything done, actually takes 45 to 50 hours per week. But isn't a major hindrance to your claim, even if you're absolutely correct on the facts and that they were doing something noble, assume that arguendo, the Hagen case, which makes it that an HR director pretty much almost can't ever have one of these claims, because they're always going to be trying to advance the law in the area? So the question becomes, first of all, is Hagen rightly decided in light of the Supreme Court's new decision? And then secondly, if it is, what do you have to do to step outside the role of an HR director or to advance claims for purposes of obtaining protection under the statute? I mean, the statute itself does not support any management exception. I mean, the statute says any employee, any employee clearly would include Mr. Miller. And so, I guess the first question is, is Hagen at all even relevant, given the Supreme Court's decision in Caston versus St. Gibson? And basically, what the Supreme Court there says is that what you need, first of all, it upheld Hagen in the sense that Hagen said that an oral complaint can be sufficient. And so, it upholds Hagen in that sense, but then it goes on to say, well, what kind of oral complaint? We understand that we don't want just every sort of grousing to become actionable. And so, it sets forth kind of a test, and it says there has to be an assertion of rights protected by the statute and a call for their protection. And it has to happen in such a context that the employer is put on notice. So, what Miller did is the classic, I mean, if you were to come up with an employer being put on notice, this would be it. He goes to the acting CEO, and he says, this is what's going on. This is illegal. He's the Director of Human Resources. If anyone in the company would know, he would know. He says, this is illegal. It's going to expose us to liability. We need to stop this, and I will personally undertake training to the supervisors to get them to stop pressuring the employees to falsify their timesheets. That's certainly not stepping out of his role. That is completely in the wheelhouse of his role, isn't it? Train the other employees, instruct the company as to what their duties are. So, is it stepping outside of his role? Probably not. But does it comply with what the Supreme Court said is actionable in Kasten? Absolutely. And so, we've got this now, this contest between the Kasten decision from the manager, but it complies with that test, and the Hagen decision. But even Hagen is, there are some exceptions to Hagen in terms of what this stepping out requires. The first big gaping hole in the Hagen decision, aside from the fact that there's no statutory support for a management exemption, the first big deal— Do you understand we have to follow it? Are you trying to argue that we should go on bonk or something? We have to follow that unless it's specifically overruled by the Supreme Court, which you've conceded the other case didn't address a manager, and it didn't even talk about stepping out. So, it can't possibly be seen as overruling it directly. What it does do is it provides a clear test for when there's statutory protection, and it provides guidance that you have to view this very broadly in terms of the purposes of the Act. And so, under those broad purposes of the Act, there's no reason to hold Mr. Miller out in a separate category. The Act clearly says, any employee. And so, what Hagen overlooks, Hagen recognizes there's an exception when you have a person with mixed responsibilities. The exception that Hagen cites for that is the York case, where you had someone who was a manager, but he was also a union president. And in his dual capacity, he goes to the chief and says, look at this new Supreme Court decision, and does this mean people are entitled to overtime wages? So, the court there recognized there's an exception where there's this dual function. So, in Hagen, there was not that dual function. In this case, there is. And the reason I say that there is a dual function in this case is that what the Hagen court does not address is that the Congress has basically said, compliance with the FLSA is so important that we're going to have individual civil and criminal liability on controlling persons in an organization. So, if the district court's interpretation of Hagen is correct, we would have this bizarre situation, where Mr. Miller, as arguably a controlling person, because he is in a position of implementing rules regarding how wages are determined, he would arguably be a controlling person. He would arguably be subject to individual civil and criminal liability for his knowledge that the company is engaging in FLSA violations. So, he could be criminally liable. He could be civilly liable, personally, not just the company, but him personally. And yet, the court would say that when he says, we can't keep doing this, we have to stop doing this, it's against the law, he would have no protection. That just doesn't make any sense. Because he's a controlling person with this potential civil and criminal liability, he then becomes, like the union chief in the York case, he's got dual responsibilities. He's got his own interests. Dual. But his own interest is commensurate with him being a manager and not wanting to be on the hook, and therefore, that is totally insimpatico with his role as the manager and the HR. It's not a dual interest. He doesn't want to be individually liable. That's—any manager doesn't want to be individually liable. So, that's not the same as the union. The union is liable. They're trying to represent the union, whereas the HR manager has to represent the company and provide information to all the employees as part of being HR manager. So, the company is adopting a policy of, let's subvert the FLSA. Let's do something, even though you're telling us it's illegal. At that point, Mr. Miller's individual interest, his individual interest in not being held civilly or criminally responsible for an illegal action becomes adverse to the company. But that's also his interest in being HR manager, to continue telling them what the law actually is. I think the HR manager makes it extremely difficult for you to argue stepping out, but perhaps you disagree. Well, I think it's the court's burden to justify why someone who is in a position to oppose illegal conduct should not be given the protection of this anti-retaliation provision when he could be subject to civil and criminal liability for engaging in this illegal scheme to cheat people out of their overtime wages. There's absolutely no language in the statute. The statute very says any employee, and again, Mr. Miller has complied with what the Supreme Court has said, that any oral complaint to the acting CEO is protectable. Do you understand, though, that if we totally agree with you and think that that's a bad rule and that the rule should allow him to make a claim, that we have to still follow the case? We are bound to. Do you understand that? Not necessarily. Not necessarily. Again, there's another exception here that the court could go to, aside from going to the York exception, which is to say that when you have a controlling person who has an individual interest that might be adverse to the company's adopted policies, aside from that exception, the court could also go with another exception that we've cited in our briefs, and that is there's an exception where the company believes that this individual employee either has or will step outside and go to the Department of Labor and instigate a proceeding with the Department of Labor. In this case, we have a situation where there's evidence showing that the company believed that Mr. Miller was about to do exactly that. He and Sam Clark, another HR employee, had made these complaints consistently in the past. Sam Clark had just been fired. In the prelude to being fired, Mr. Miller learned that the company was monitoring her network activity on the system. Basically, she was fired immediately when she was subject to the reduction in force, unlike other employees who were given a couple of weeks to kind of wrap up their affairs. And Mr. Miller asked about this, and the answer was she's an organizational risk, and so a risk to go to the Department of Labor. So she was therefore regarded as someone who was at risk of going and doing something adverse to the company's perceived interest by going to the Department of Labor. So we've cited two other circuit cases where the company believes the person is going to the Department of Labor or assist people going to the Department of Labor, then that's good enough to invoke the statute. So that would be a simple and easy exception to get outside the decision in Hagan. Hagan didn't address that issue. Hagan didn't address the issue of whether or not the manager in that case was someone who was a controlling person who would have individual civil and criminal liability. So the court can easily distinguish Hagan on either of those two grounds without necessarily overruling it or finding that the Supreme Court's decision in Kasten overrules the decision. Why isn't your retaliation claim totally voided by the fact that your client was fired for falsifying background checks? Well, the simple answer is he didn't falsify anything. He did have a prior criminal incident. He didn't perform background checks on people he was supposed to perform, and he said he did, including himself, as to whether or not there was a criminal background. He did subject himself to background searches. There were two systems of searches that were used. One was to simply go to the Department of Texas, basically go through the driver's license agency, and you run your name, and they tell you if anyone's been convicted of a criminal event. The other way to do it, and they used this for situations where there was a criminal incident, is to go and have an outside company do it based on fingerprints, and that's what he did. He went to the outside agency, he did his fingerprint, and it came back and confirmed what everyone knew, that he hadn't had any criminal incidents aside from the incident in high school. So that incident in high school was known. It came up in the criminal background search when he was hired. He discussed it. That information was communicated at the time. There's dispute as to whether it was communicated, but it was communicated, arguably, to the person who made the decision to fire him. So there's no fraudulent activity trying to conceal any criminal history. It was all disclosed. Metricare knew about it when they hired him. They checked the criminal history immediately before they fired him, and nothing new had come out. Wasn't he supposed to perform background checks on other employees, and he said he did, but he didn't? It was in his department. He assigned Ms. Ross and Mr. Corlew to design a new program that would go back and automatically check everyone, and so he assigned them to do it. He later learned that they had failed to do it. The day before he was fired, he instructed – they were changing the way they were doing it. The day before he was fired, he instructed them to go back, and because they were changing the system, to run a criminal background check on everyone in the company, including himself. So there's just – it's not true. All right, thank you, Mr. Crouch. Mr. Geary? May it please the Court, Joel Geary for Pele Metricare Services, Linda Thompson, and Kyle Munson. Let me address the question that Judge Clement posed towards the end, and that is, regardless of whether any of the activity that Mr. Miller engaged in was protected or not under the federal statutes, whether Metricare had a legitimate and non-retaliatory basis to terminate him. The answer from the record is yes. He clearly excluded himself from annual criminal background checks in 2010, 2011, and 2012. He also indicated to one of his subordinates that he had run checks on 70 employees in December of 2012, when, in fact, he had not run those. The person responsible for uploading in Metricare's Human Resources Information System a confirmation as to whether those checks had been run or not was Mr. Miller himself. It turns out that those records were updated to indicate that the checks had been run, but we know, as a matter of fact, they had not been run. He excluded himself three times, and he failed to run them on other employees. There's no dispute in this case as to that. So regardless – Isn't it kind of the opposite, though, on the checks being run? Because for some reason, which I don't really get, the program was set up to indicate that automatically the people had been checked, rather than to do it after the check had been run. No, there's no evidence. What Mr. Crouch mentioned is that there was an effort at Metricare towards around this time frame to design some sort of system that would allow them to take mass information from these checks and automatically update the system. That system was not in place at the time. I thought the record is that the system that was in place would, like, every month put the people and show that they were fine for background checks, but in actuality they weren't yet fine. So it wasn't falsifying that they had had the background checked. It was a default system that said that everybody was checked, but they weren't. So it's a different situation than going and making an entry. The entry was already there that everybody was checked, and it was not following up on that. I'm not saying that it was a good thing to do, but I don't think that the record is that they were checking that the check had been made. The system automatically defaulted to say everybody was in good standing. Yeah. If that's in the record somewhere, you'd have to show it to me, because that's not the way it works. It simply isn't the way it works. Regardless of that, Mr. Miller doesn't dispute that every year he was the one required to identify each month a list of employees who had to be checked, because they were checked by birth month. So he would have to go through and say, of our 750 employees, these are the employees available to be checked, give that list to a subordinate who would then run the checks through the annual DPS system. There's no dispute in this case that Mr. Miller excluded himself from that list for three years, 2010, 2011, and 2012. It's not clear to me why he excluded himself. In his deposition, he indicated that he felt that because he was not a direct care provider. You understand that MetroCare is a mental health and retardation agency that deals with the disabled and people who are vulnerable to bad persons. And so those who provide direct care clearly cannot have certain criminal convictions on their history. But if you look at the regulations applicable to MHMR centers in Texas, there are 39 of them, those regulations indicate that no employee of the center can have a certain conviction. There's a list of maybe 15 or 20 of those convictions. There's assault, sexual battery, murder, things like that. So MetroCare has to ensure that every year, existing employees, not just Africans, but existing employees have not incurred a criminal conviction that would disqualify them from working for the center. But somebody told him initially that he had a criminal conviction. He did. Why was he hired? Because his conviction was not on the list. His conviction was a minor theft issue. They didn't know the details of the conviction, but it didn't show up on the list of disqualifying convictions, so he was hired. So they have to run these every year. Mr. Miller was the one who created the list to run them every year, and Mr. Miller took his name off the proposition. He took his name off because he didn't believe he, because he wasn't a direct care provider, he didn't have to submit himself. But when I asked him if his deposition wasn't at the practice to run everybody at MetroCare, his answer was yes. So he knew that was what was required. He just failed to do it. Why did he fail to do it? You take me outside of the record and you require me to speculate, but the immediate answer is he didn't want his supporters running those to know that he had that conviction and gossip in the center about it. I can understand that, but that doesn't justify the HR. You mean the old conviction? Huh? You mean the original conviction? The original conviction, yes. And I can understand that concern, and I feel for that, but the reality is the HR manager of the 700-800 employee public agency has responsibility to ensure that those criminal background checks are run on employees at that center and excludes himself from the very process. If that's not a legitimate reason to terminate him, I don't know what is. So let me swing back to the issue of whether there's protected activity under the Fair Labor Standards Act. Mr. Crouch's contention was that Kasten somehow affects this court's prior decision in Hagen. It doesn't. Kasten dealt simply with the issue of whether an oral complaint was sufficient under the Fair Labor Standards Act to constitute a complaint, oral versus written. And of course, in Hagen, this court actually held that an oral complaint was sufficient, and Kasten simply dealt with that issue. Kasten said, yes, an oral complaint is sufficient. The court didn't say anything further that would damage or deprecate the Hagen rule. In fact, the court said at 1334 in the Supreme Court Reporter version, the employer must get fair notice that a grievance has been lodged. Well, that goes right to the issue of McKenzie and Hagen, which is the employer has to understand that what's happening here is something outside the ordinary role of ensuring compliance or ensuring compliance with the law. The employer has to understand that, no, this person has stepped outside of that role of being an HR person or a compliance person or general counsel or in-house counsel and has gone to the Department of Labor and made a complaint. For example, in some of the cases where you see HR managers or in-house counsel be successful in these cases, it's where they do step out. They file a complaint with the Department of Labor, or they contact somebody at one of the federal agencies and say, hey, I think we've got an issue over here. I want you to come check it out. Well, that's real. But Hagen, you don't think, precludes them going to the, an HR director can still raise an FLSA by going to the Department of Labor? I think so. Even after Hagen, it doesn't totally preclude HR claims? Yeah, in my opinion, that's, and it shouldn't. I mean, in my opinion, at some point, if a general counsel, HR director, somebody in the line of fire on these issues feels like they're not getting a response from senior managers, feels like there are real issues, I guess it's a very tough decision for that person to make. But yeah, I think if they do step outside and they do go to the Department of Labor or they go to some other enforcement agency, EEOC, whatever agency they're in, I think, yeah, I think arguably, at that point, they're clearly acting adverse to the entity, and they do have a claim. And I think under even McKenzie's rationale, which is the Tenth Circuit opinion that this Court relied on in Hagen, even under McKenzie's rationale, that would be the case. And there are cases, there's a case called Benge v. Highgate Holdings by Judge Bowles in the Northern District, where that's exactly what happened. The HR manager urged compliance internally. It didn't happen. She got a little upset about it. She contacted the Department of Labor. Judge Bowles said, that's fine. That's stepping outside of the role. So I do think there are instances where compliance employees, in-house lawyers, HR employees do have the ability to be protected under this statute. It's just not in their ordinary role of doing what they do every day. Because when you think about it, it would be virtually impossible to terminate. Because what they do every day is they provide guidance on the law. In-house lawyers, same thing. They're asked questions. Does this comply with the law? They provide an answer. Management doesn't like the answer. They go to outside counsel. Outside counsel gives a different answer. They say, you know, I'm going to fire you. You don't know what you're doing. Well, that's her job, though. That was her job. She's providing compliance activities for the agency. I have 11 minutes left. There were a number of claims asserted in this case. I'm not really sure what you want to hear about, and I don't want to regurgitate my brief. I think as a general proposition, all of the claims that are non-Section 1983 claims, the FMLA claim, the FLSA claim, the ADA claim, I think the legitimate non-discriminatory reason undercuts all of those. But I do want to focus briefly on the Section 1983 claim. So the failure to perform the background check, that takes care of the ADA, and we don't have to deal with whether he asked for a data assistant or not. You're talking about the ADA. There were multiple parts to the ADA claim, and it was kind of a moving target that revolved throughout the trial court. We ended up with a discrimination and retaliation claim. I think the legitimate non-discriminatory reason undercuts those. The reasonable accommodation claim, which became a branch that developed after about the third or second complaint, I think is undercut because, first of all, it's our contention that he didn't make a reasonable accommodation. But if he did, if he made that request, the request was to rehire an employee that we had just laid off for cost-saving reasons to come back in and help him do data entry. I mean, that's really specific, and that would be not commonsensical. But you could say that you require some sort of data entry accommodation, and that's sometimes an ADA requirement in the law. But you can request data help. That is a normal ADA requirement. So can you help me with that one, that claim? Okay. Well, first of all, his claim wasn't, I want help with data. His claim was, I want you to hire somebody to come do it for me. And in particular, I want you to hire this person to come back and do it. So it wasn't really a vague database claim. If he had said, yeah, I need some help entering data, then probably we could find somebody else in the department. Now, they're already down two people at that point in that department because of the layoffs to try to find somebody else or bring in temp help to potentially help with data entry. Now, again, let me back up. The reasonable accommodation, the retaliation, and the discrimination ADA claims all also assume something else. And what is that something else? That Mr. Miller is actually disabled. The only evidence we have of that is Mr. Miller's declaration and deposition testimony where he testified that 40 years ago in elementary school when he was in seventh grade, one of his counselors indicated to him that he might be dyslexic. That's our evidence of dyslexia in this case. Okay? Now, we have no vocational records. We have no educational records. We have no medical records. We have no independent, expert corroboration of this dyslexia as a disability. So before you even get to the accommodation issue of those claims, determine whether there's enough evidence to support the fact that there was a disability here. I think it's highly questionable that that evidence, that just him saying, I have dyslexia, is enough. Otherwise, anybody can walk into a court at any time and say, you know what? I've got a mental health issue. I've got this issue. I've got that, without any corroboration whatsoever. I agree that corroboration is not required if it's something that the jury can perceive on their own. Missing limbs, something of that nature. But when somebody says, I have a condition that's not particularly apparent to anybody, there needs to be some medical, vocational, some type of backup that corroborates that. And there's none of that here. So let me turn to my final minutes to the due process claim, Section 1983 claim. If you've read the brief, you understand that Miller contends that his constitutional liberty interests were violated when he was not given the opportunity to compel MetroCare employees to testify about his termination in an open meeting of the Board of Trustees after he was terminated. Now, that argument springs from Board of Regents v. Roth, where the Supreme Court indicated that in certain circumstances, even an at-will employee who has been stigmatized by the government's allegations at the time of his termination may have the right to some sort of name-clearing hearing. In this circuit, the Court has developed a seven-factor test. I won't go through all the factors of that test. One of the elements, of course, is that the accusations made by the government are false. It's our contention that the accusations are not false. But assuming that there's a fact issue on that, two other elements that Miller has to establish to get to the right to a name-clearing hearing is that MetroCare actually published the reasons for his termination. In other words, that the stigmatizing information was taken outside of MetroCare and published to the public. That's one element that has to be proven to have the right to a name-clearing hearing. In the vast majority of those name-clearing hearing cases, what happens is the government publishes that termination basis to the media. You know, the county sheriff stands up and says, I terminated the deputy county sheriff because he was having an affair with somebody in the office or because he defrauded the federal government. He publishes it to the media. That didn't happen here. There was no discussion with the media, no discussion outside of MetroCare about the basis for Mr. Miller's termination. Instead, Mr. Miller has a relatively novel theory. His theory is that because the Texas Public Information Act, which essentially is the Open Records Act in Texas, which essentially requires governmental entities in Texas to make available all their records, with some exceptions, to the public if they're requested, Mr. Miller's contention is that, well, because my termination records, the letter terminating me, the memorandum supporting that, because those records were included in my file, or basically because they were created and MetroCare had possession of them, that somebody could ask them in the Public Information Act, and therefore they are public and MetroCare has made them public. To me, that's nonsensical. To me, that means that any time a public employee is terminated under circumstances that are arguably stigmatizing, and those reasons have been documented somewhere, whether they're in an email, a memorandum, to me, that essentially means that the public agency has to give a name-clearing hearing in any of those instances. Well, every day, there are thousands of governmental employees in Texas, state, local, cities, counties that are terminated under situations that are arguably stigmatizing, fraud, what have you, and simply because there are records in their file that might, at some point, five years from now, be requested under the Public Information Act, to me, that's not publicizing. The government is not intentionally publicizing the records simply by creating it. Now, Mr. Miller also argues that, in this case, his records were actually requested by a member of the public. That's correct. He contacted one of his friends, Ross Heidman, in Arkansas. Mr. Heidman sent an open record requesting MetroCare, requesting Mr. Miller's personnel file. Now, I knew at the time, I handled the response from MetroCare, I knew at the time that if I produced Mr. Miller's, I knew what was going on, I knew who Mr. Heidman was, I knew he was Mr. Miller's friend, and I knew that if I produced Mr. Miller's termination records, that Mr. Crouch and Mr. Miller would then argue that MetroCare had voluntarily publicized those records. So, what I had to do was, and I knew what the answer was going to be from the Attorney General, but I had to ask the Attorney General for an opinion as to whether those records should be disclosed. I knew what the answer was going to be because I've been doing this 20 years. The answer was going to be, yes, Mr. Gary, they have to be disclosed because they pertain to the performance of a public employee. So, I was between a rock and a hard spot, and what I did, I got the AG to give me an opinion, he gave me an opinion, I then turned those records over to Mr. Heidman. So, the fact that those records were produced in this case under the Public Information Act doesn't help him either. One, it just goes to the point of the very creation of these records shouldn't give you the right to a name-clearing hearing, but two, if you yourself are the one who actually ended up causing the records to be publicized, you don't get a name-clearing hearing. Final point, even if we publicized the records, and he was entitled to a hearing, he got one. We allowed him and his attorney to come to the Board of Trustees in a public meeting, and we allowed them to present any records they wanted to present, present witness statements if they had them, to provide voluntary witness testimony if they had it. For example, Sam Clark, who was one of Mr. Miller's subordinates, supported him. She was at the meeting. They didn't call her to testify, though. So, they had the ability to do whatever they want, except I would not allow them, MetroCare would not allow them to compel MetroCare employees to testify at the name-clearing hearing. That's because the law does not require that. No circuit other than the Tenth, and the Tenth has done this on a limited basis, but every circuit that I've seen has said that you do not have to require trial-type, full-blown trial-type cross-examination procedures in a name-clearing hearing. The First, the Fourth, the Sixth, the Seventh, and the Eighth have all held that full-blown compulsory cross-examination is not required, and those cases are cited in the brief. The Tenth Circuit, in one case, did indicate that where in that particular case the employee was charged with misconduct by undisclosed reports. In other words, it made the accusations, and what the accusations were. The Tenth Circuit held that, in that case, I think it was a school district. The school district needed to present those persons who made those reports so that the attorney for the employee could cross-examine those persons. In this case, Mr. Miller knew why he was being terminated. I provided 700 pages of records to him and his counsel prior to the hearing that included all the basis for the termination. They knew what the termination basis was. They came in, they made a presentation, they had an opportunity to do everything they wanted to do, and they did it in an open public meeting. So, in my opinion, the Section 1983 claim was properly dismissed by Judge Fitzwater twice, first at the 12B6 stage and then second at the summary judgment stage. I'll close by simply saying that I believe the summary judgment granted by Judge Fitzwater should be affirmed. All right. Thank you. Back to you, Mr. Crouch, for any rebuttal. Yes, just a few items. Judge Elrod, you had questioned the issue regarding the ADA claim. Mr. Miller has had dyslexia since he was a child. He's consistently requested reasonable accommodations from employers and from educational institutions throughout all that time. There's no requirement Is that in the record? It is. There's no requirement that a claim of disability be supported by expert testimony, especially when it's within the understanding of the jury. Did he ask for an accommodation? Did he tell while he was working for this company? Did he tell them, I'm dyslexic, or did he wait until he was fired? He told them while he was working. He requested the reasonable accommodation. He explained he had dyslexia, that he needed assistance in data entry, because he juxtaposes numbers. If you're going to have him entering data for these terminated employees, and if you juxtapose numbers, it's even worse than juxtaposing letters in a word, because you don't know what the number is supposed to be. In what time frame? When? Not a specific date, but in this whole process. I believe it was in the early January time frame, early January 2013, before he was terminated in February 2013. But he had been working there. I'm sorry, go ahead. That's when he made the request for the reasonable accommodation. He had been getting reasonable accommodations from other employees within the HR department. They were giving him assistance in terms of proofreading emails before they went out. Sam Clark, in her declaration, confirms and corroborates that he had disclosed the dyslexia condition, that she was providing him assistance in proofreading important emails that are going out to the company to help catch typos and things like that. How did he function all this time? He's got an impairment, but he's not an invalid. It causes problems. He has trouble proofreading, because he juxtaposes letters. Well, it's not germane. It's just sort of interesting. As long-term an employee as he was, I'm not questioning whether he had dyslexia, but presumably he had these functions and others throughout all that period of time, and it's not until this time period. But anyway, we accept what you say. He did, and as I mentioned, Sam Clark, who worked for a number of years in human resources with him, her declaration corroborates that he had disclosed the dyslexia condition for many years, but it wasn't until the beginning of 2013 when he requested the reasonable accommodation. There's no dispute that data entry is an essential function of the HR director position. But it's not a reasonable accommodation to have to rehire somebody who's been fired. You can look for people within the company that could come and do the work or hire a person back is not requesting a reasonable accommodation, is it? So the request for the reasonable accommodation is supposed to initiate a dialogue with the company whereby they negotiate what the reasonable accommodation will be. The suggestion he made is that an employee who was fully trained, fully knowledgeable in the systems be brought back in on a part-time basis to do the data entry function. MetroCare could say, well, that's not reasonable. We'll get you somebody else. And they could have that dialogue, but when they refuse it and don't suggest any alternative, then it infringes Mr. Miller's rights under the ADA. So they could have had somebody else provided who was still employed and trained them. What they actually did was, after they got rid of Mr. Miller, is they actually hired a new person to come in and do the data entry for them. So none of the existing employees were suggested, which was hire someone to come in and do the data entry, and that person was eventually hired full-time. So Mr. Miller's suggestion was, well, why not get someone that we know is currently unemployed and currently trained on all our systems and just have them do that data entry work? So it's not an unreasonable suggestion. They certainly could say, no, we don't want to do that for whatever reason, but they have to at least have a dialogue of what is a reasonable accommodation, and if we can't do that because it's an undue burden, maybe we can do this instead. What part of that claim rises or falls if it was legitimate to terminate him for allegedly not running the background checks? I think there's still a claim that if they refuse the reasonable accommodation, that's still a violation of the ADA. I think the problem you get into is For one month? Pardon? I mean, it's at the tail-end of his employment, right? Yes. Two months before that dialogue would have even started? Am I wrong on the timing of that? It's in that same time period. I mean, there's an issue on damages, but I think there's still a violation of the ADA for them refusing to provide the accommodation, refusing to engage in that process, and then they actually include as part one of the reasons for termination not one of the reasons disclosed in the termination memo, but one of the afterthought reasons is failure of him to do this wellness fair, and that was part of the reasonable accommodation. If you're going to fire my employees that have been doing this wellness fair, I need some help or an extension of time on that. They actually cite that as a reason for the termination, so I think it arguably is a factor that goes to the termination because they say so. All right. Thank you, Mr. Crouch. I think we have your argument. If I may just add quickly Oh, you got a red light there, Mr. Crouch. All right. I think we fairly have all the arguments.